UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

KENNETH AND SARAH MATCHNIFF,

        Plaintiffs,

    v.

GREAT NORTHWEST INSURANCE COMPANY,

        Defendant.

Case No. 6:15-cv-00193-AA
OPINION AND ORDER

AIKEN, District Judge:

    Plaintiffs Kenneth and Sarah Matchniff filed suit against Great Northwest Insurance Company alleging breach of an insurance policy after they submitted claims for loss arising from water damage to their home. The parties dispute whether they have complied with the terms of the policy and now file cross motions for partial summary judgment.

## I. BACKGROUND

    On or about December 11, 2013, while plaintiffs were away on vacation, a water pipe in their home froze, cracked, and thawed, causing substantial damage. Plaintiffs filed a claim for

1 – OPINION AND ORDER

coverage under the terms of their Homeowner's Insurance Policy (Policy) with defendant. Defendant has no presence in Oregon and hired a local insurance adjuster, Norcross, to work with plaintiffs on its behalf. Norcross, in turn, assigned its employee, Trevor Winter, to adjust the loss.

Winter met plaintiffs at their home to make an initial investigation of the damage and discuss the next steps for adjusting the loss. Plaintiffs then contracted with Summit Restoration to begin remediating the water damage to the structure of the home and their personal property.

Shortly after the loss, plaintiffs moved their family into a rental property that they owned. Approximately one month after the loss, the property was rented to a third party and was no longer available for plaintiffs' use. Plaintiffs then moved into a hotel for approximately six weeks while both they and defendant attempted to locate more suitable, temporary housing. Plaintiffs were eventually able to locate suitable housing. For over eight months after the loss, defendant provided plaintiffs with a fixed monthly payment to cover their additional living expenses (ALE). Defendant did so despite the fact that plaintiffs failed to provide requested documentation of their expenses.

On February 3, 2014, Norcross generated an estimate of damages totaling $85,965.23 in actual cash value (ACV) and $126,186.08 in replacement cost value (RVC). On February 6, 2014, defendant issued an ACV payment of $84,965.23 in accordance with the initial ACV estimate, less $1000 for plaintiffs' deductible.

Defendant informed plaintiffs that they must contract with a licensed contractor and complete the repairs on the home to receive the RCV, i.e., the difference between the cost to complete the repairs and the initial ACV payment. Plaintiffs allege that they were unable to contract for repairs because the initial ACV estimate and payment were insufficient. Plaintiff

2 – OPINION AND ORDER

apparently had obtained estimates totaling over $350,000 to repair the damage.

On August 19, 2014, defendant obtained an estimate of damages with an RCV of $173,738.86. The estimate did not include an ACV amount.

On February 3, 2015, plaintiffs filed this action alleging that defendant breached the Policy and seeking damages for replacement of their dwelling and its contents and for loss of use. On February 19, 2015, defendant obtained a third estimate of damages with an RCV of $153,401.74 and an ACV of $121,891.11. On February 10, 2016, defendant obtained yet another estimate of the damages, with an RCV of $173,738.86 and an ACV of $138,406.82.

On May 14, 2016, plaintiffs amended their complaint and added a claim alleging breach of the duty of good faith and fair dealing.

## II. STANDARD

To succeed on a motion for summary judgment, the moving party must establish that "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). A fact is material if it "is relevant to an element of a claim or defense and [its] existence might affect the outcome of the suit." *T.W. Elec Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (1987). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The initial burden is on the moving party to establish that there are no genuine disputes of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets that burden, the nonmoving party must "go beyond the pleadings," and "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324. On a motion for summary judgment, the court views all evidence and inferences in the light most favorable to the nonmoving party. *Allen v. City of Los Angeles*, 66 F.3d 1052, 1056 (9th Cir. 1994).

III. DISCUSSION

Plaintiffs and defendant move for summary judgment on a number of issues. Plaintiffs argue that defendant breached the Policy by failing to supplement its ACV payment and by providing insufficient ALE expenses. In turn, defendant maintains that it complied with all provisions of the Policy and argues that plaintiffs breached the Policy by failing to cooperate and failing to act in good faith. The parties also contest the meaning and application of Policy provisions concerning actual cash value and functional replacement cost.

To succeed on a breach of contract claim a plaintiff must show: 1) the existence of a contract; 2) the relevant contract terms; 3) that the plaintiff fully performed and did not breach the contract; and 4) that the defendant breached the contract terms resulting in damage to the plaintiff. *Slover v. Or. State Bd. of Clinical Soc. Workers*, 144 Or. App. 565, 570, 927 P.2d 1098 (1996).

A. *ACV Payment and Replacement Coverage*

Plaintiffs argue that defendant should have supplemented its ACV payment when it obtained ACV estimates higher than the amount previously paid. Plaintiffs contend that the failure to supplement the ACV "constitutes a breach of the Policy." Pl.'s Motion at 14.

However, plaintiffs fail to identify the relevant language of the Policy that required defendant to supplement its AVC payment when it obtained higher estimates. Likewise, plaintiffs do not identify the Policy provision under which they filed their claim, and they do not submit any evidence indicating they sought coverage under a specific provision of the Policy. In their reply, plaintiffs cite § C.2.e.2 of the Modified Functional Replacement Cost (MFRC) Endorsement, which states, "You may disregard the 'functional replacement cost' loss settlement provisions and make claim under this policy for loss to buildings on an actual cash value basis."

Gower Decl. Ex. 1 at 81. However, plaintiffs do not provide evidence that they submitted their claim under this specific provision or that they notified defendant of their intent to disregard the functional replacement cost provisions.[1]

Instead, plaintiffs rely solely on *Beck v. Metropolitan Prop. & Cas. Ins. Co.*, 2015 WL 4112343 (D. Or. July 6, 2015). There, the plaintiff's home was damaged in a fire. Following the fire and a claim by the plaintiff, the insurer issued an allegedly inadequate ACV payment. *Id.* at *2. Subsequently, the insurer received a series of revised, higher estimates but refused to supplement the ACV payment. *Id.* The policy at issue required the insurer to pay the ACV "at the time of the loss," and the court held that the insurer had breached the policy because all of the revised ACV estimates were higher than the amount paid by the insurer. *Id.* at *4-5, 7. Plaintiffs argue that *Beck* mandates the same result in this case, because defendant obtained ACV estimates that were higher than the initial ACV payment.

However, unlike *Beck*, plaintiffs point to no language in the Policy requiring defendant to supplement the ACV payment rather than paying the difference after plaintiffs completed repairs, as defendant indicated. I cannot discern the Policy language plaintiff relies on to support their claim and motion, and it is not the role of this Court to ascertain what provision of the Policy supports plaintiffs' breach of contract claim. Rather, plaintiffs must identify the relevant Policy terms that support their claim to establish defendant's breach. They fail to do so.

Plaintiffs also assert that one of defendant's designated 30(b)(6) witnesses, Matt Warren, admitted in his deposition that defendant breached the policy by failing to supplement its ACV

---

[1] Similarly, § C.2.b. provides: "If you do not make a claim under **2.a.** above, we will pay, after application of any deductible, the least of the following amounts: (1) The limit of liability under this policy that applies to the building; or (2) The actual cash value of the damaged part of the building." Again, plaintiffs provide no evidence that they submitted their claim under this provision.

payment.[2] Gower Decl. Warren Dep. at 46-50. Defendant disputes that Warren was a designated witness on this topic. Defendant designated Warren as the witness to discuss "the handling of the claim prior to litigation," and Tony Van Eck as the witness to discuss "the policy, policy interpretations, and policy defenses." Martin Decl. 2 (doc. 50). Whether defendant designated or authorized Warren to discuss the issue of ACV payments is a genuine issue of material fact. A reasonable jury could find that Warren was not designated or authorized to speak on the sufficiency of defendant's ACV payments. Accordingly, plaintiffs are not entitled to summary judgment on their breach of contract claim with respect to the ACV payment.

Defendant moves for summary judgment on grounds that it fully complied with the relevant MFRC. Defendant argues that under § C.2.a. of the MFRC Endorsement, plaintiffs were required to contract for repairs before defendant was obligated to make additional payments. Section C.2.a provides that defendant will pay under the Policy:

> if, at the time of the loss, the amount of insurance in this policy on the damaged building is 80% or more of the "functional replacement cost" of the building immediately before the loss; and you [the insured] contract for repair or replacement of the damaged building for the same use[.]

Gower Decl. Ex. 1 at 80. Defendant thus argues that it was not required to provide additional payments until plaintiffs contracted for repair of the premises, and they failed to do so.

Like plaintiffs, defendant fails to establish that this particular provision of the MFRC Endorsement governs plaintiffs' insurance claim and defendant's obligations under the Policy. In fact, neither party provides evidence showing that plaintiffs submitted their insurance claim pursuant to a particular provision of the Policy. Moreover, plaintiffs contend that defendant's

---

[2] Federal Rule of Civil Procedure 30(b)(6) provides that a "named organization must…designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf" and "may set out the matters on which each person designated will testify."

6 – OPINION AND ORDER

underpayment and undervaluation of the ACV prevented plaintiffs from complying with the conditions necessary to obtain replacement cost benefits. It remains an issue of material fact whether defendant's alleged failure to supplement the ACV payment prevented plaintiffs from contracting for repairs. Therefore, summary judgment on this issue is not appropriate.

B. *Additional Living Expense Payments*

Next, defendant moves for summary judgment on the issue of Additional Living Expense (ALE) payments and argues that the ALE payments were sufficient under the terms of the Policy. The relevant Policy provision provides:

> **1. Additional Living Expense**
>
> If a loss covered under Section I makes that part of the "residence premises" where you reside not fit to live in, we cover any necessary increase in living expenses incurred by you so that your household can maintain its normal standard of living.
>
> *Payment will be for the shortest time required to repair or replace the damage* or, if you permanently relocate, the shortest time required for your household to settle elsewhere.

Gower Decl. Ex. 1 at 9 (emphasis added).

Defendant began making ALE payments on December 11, 2013 and continued to make payments for approximately eight and a half months before ceasing payments on August 31, 2014. The parties and their respective expert witnesses agree that the damage to plaintiff's home would take between four and six months to repair. Based on those estimates, and allowing for a reasonable amount of time for plaintiffs to hire a contractor, defendant argues that the "shortest time required to replace or repair" the damages was no more than eight months. Plaintiffs respond that defendant's failure to supplement its ACV payment prevented them from contracting for repairs and required an extension of ALE payments until plaintiffs had sufficient funds. Accordingly, plaintiffs maintain that the "shortest time required" to repair was not

7 – OPINION AND ORDER

necessarily limited to eight months.

The Policy does not define "the shortest time required to repair or replace the damage," and does not indicate whether factors unrelated to the actual construction or repairs, such as disputes over coverage, for example, affect the amount of time "required." Given the parties' disputes over the sufficiency of the ACV payment and whether defendant was required to supplement it, I find that questions of fact preclude summary judgment on this issue. If defendant was required to supplement the ACV payment, and if its failure to do so interfered with plaintiffs' ability to repair the structure, the "shortest time required" would not be limited to the eight-month period after the loss. Therefore, defendant's motion for summary judgment is denied.

C.   *Non-Cooperation and Good Faith Affirmative Defenses*

Both parties move for partial summary judgment on defendant's affirmative defenses of failure to cooperate and breach of the duty of good faith and fair dealing.

Defendant first maintains that plaintiffs breached the Policy by failing to comply with defendant's requests for ALE documentation as required and by failing to hire a contractor to repair their home. *See* Gower Decl. Ex. 1 at 17 ("Duties After Loss"). As a result of their noncooperation, defendant maintains that plaintiffs did not perform under the Policy and cannot sustain a breach of contract claim against defendant. Plaintiffs argue that defendant waived or should be judicially estopped from asserting the affirmative defense of noncooperation.

To establish the affirmative defense of noncooperation in Oregon, an insurer must prove that: 1) it acted with reasonable diligence and made good faith efforts to secure the cooperation of the insured; 2) the insured willfully failed to cooperate, and 3) the insurer was prejudiced. *Rosalez v. Unigard Ins. Co.*, 283 Or. 63, 67, 581 P.2d 945 (1978) (discussing willfulness); *Bailey*

8 – OPINION AND ORDER

*v. Universal Underwriters Ins. Co.*, 258 Or. 201, 224-25, 474 P.2d 746 (1970) (discussing diligence and prejudice). Defendant argues that it repeatedly requested documentation of plaintiffs' ALE expenses and that they failed to provide information regarding their temporary housing, costs for renting furniture and electronics, and other living expenses. Martin Decl. Exs. F, I, K, U. Defendant also emphasizes that plaintiffs did not contract for repairs despite the Policy's requirement to do so in order to obtain RCV payments. Defendant maintains that it has been prejudiced by issuing ALE payments to which plaintiffs were not entitled and by being forced to defend plaintiffs' allegations. Plaintiffs respond that defendant cannot show it acted with reasonable diligence, because defendant gave plaintiffs no deadlines for producing information and did not repeat its requests for certain information. Plaintiffs further argue that defendant fails to show actual prejudice arising from plaintiffs' alleged acts of noncooperation, given that defendant did not supplement its ACV payment and ceased ALE payments after approximately eight months.[3]

Although defendant's argument and evidence concerning plaintiffs' lack of cooperation is persuasive, the question of whether defendant acted with "reasonable diligence" and whether it suffered prejudice are questions of fact. While defendant's letter and email requests sought additional information from plaintiffs, defendant did not warn plaintiffs that they were failing to cooperate or at risk of forfeiting coverage, aside from the possible exception of a March 2014 email from Winter. Martin Decl. Ex. F, I, K, U. Therefore, defendant's motion for summary judgment on its noncooperation defense is denied.

---

[3] Plaintiffs also argue that the information requested by defendant exceeded the scope of their duties under Or. Rev. Stat. § 742.230. Pl.'s Response to MSJ at 19. However, § 742.230 recites provisions that must be included in fire insurance policies; it does not define or limit an insured's duties under an insurance contract. Regardless, defendant's requests did not exceed the scope of this statute.

9 – OPINION AND ORDER

Plaintiffs also argue that defendant waived or is estopped from asserting this defense and move for summary judgment on this issue. To establish waiver, plaintiffs must show that defendant intentionally and unequivocally relinquished or abandoned "a known right or privilege." *Moore v. Mut. Of Enumclaw Ins. Co.*, 317 Or. 235, 240, 855 P.2d 626 (1993); *adidas-America, Inc. v. Payless Shoesource, Inc.*, 546 F. Supp. 2d 1029, 1074 (D. Or. 2008). Plaintiffs argue that because defendant provided coverage to plaintiffs despite their alleged failure to document their expenses or contract for repairs, defendant intentionally relinquished its right to assert noncooperation. Defendant acknowledges that it made ALE payments despite plaintiffs' noncooperation but argues that it never intended, either explicitly or implicitly, to waive its right to assert noncooperation as an affirmative defense. Defendant's argument is bolstered by the fact that it continued to request documentation and informed plaintiffs that it did not intend to waive any terms or conditions of the Policy. Gower Decl. Ex. 12 at 9. Nevertheless, whether defendant's actions, individually or in the aggregate, constituted an implicit waiver of noncooperation is a question of material fact. Accordingly, plaintiffs' motion is denied to the extent that defendant waived the affirmative defense of noncooperation; however, plaintiff may raise the issue of waiver at trial.

Plaintiffs also contend that defendant is estopped from asserting a noncooperation defense based on its actions. To establish estoppel in the context of an insurance contract, the insured must establish "a representation or conduct amounting to a representation by someone acting on behalf of the insurer that was inconsistent with the express terms of the policy and that [plaintiffs] reasonably relied on the representation." *Kabban v. Mackin*, 104 Or. App. 422, 426-27, 801 P.2d 883 (1990). Plaintiffs contend that defendant, by remaining silent about plaintiffs' alleged noncooperation and continuing to treat the Policy as binding, falsely represented that

plaintiffs were in compliance with Policy requirements, despite defendant's belief that plaintiffs had failed to cooperate. Plaintiffs emphasize that they were unaware that defendant believed them to be noncooperative, and that defendant intended and induced them to act upon the falsity.

However, the evidence is insufficient to show that defendant's representations or actions – seeking documentation and making payments – were false or inconsistent with the express terms of the Policy. Plaintiffs also fail to show that defendant believed plaintiffs to be in breach but nevertheless induced plaintiffs into treating the Policy as valid and enforceable so that defendant could argue that plaintiffs were in breach all along. Even if plaintiffs could meet these elements, they fail to show that they acted in reliance on defendant's alleged false representation. To the contrary, the only reliance plaintiffs cite is their continued efforts to provide information requested by defendant. Pl.'s Motion at 25. Accordingly, plaintiffs' motion for summary judgment on this issue of estoppel is denied.

Finally, the parties move for summary judgment on defendant's affirmative defense of good faith. Defendant argues that plaintiffs' delays and failure to cooperate breached their implied duty of good faith and fair dealing. Every contract contains an implied duty of good faith, "to be applied in a manner that will effectuate the reasonable contractual expectations of the parties." *Pac. First Bank v. New Morgan Park Corp.*, 319 Or. 342, 353, 876 P.2d 761 (1994) (citation omitted). For the reasons explained above, I find that issues of fact remain regarding whether plaintiffs' alleged noncooperation breached their implied duty of good faith and fair dealing and the parties' expectations under the Policy.

D. *Functional Replacement Cost*

The parties dispute the meaning of "functional replacement cost" within the MFRC Endorsement and move for summary judgment accordingly. Specifically, the parties dispute

when a damaged structure may be repaired or replaced with less costly, functionally equivalent methods or materials. The MFRC Endorsement provides:

> "Functional replacement cost" means the amount which it would cost to repair or replace the damaged building with less costly common construction materials and methods which are functionally equivalent to obsolete, antique or custom construction materials and methods used in the original construction of the building.

Gower Decl. Ex. 1 at 80. Plaintiffs assert that the definition should be interpreted to mean that defendant may use less costly replacement materials and methods *only* when "obsolete, antique, or customs" materials and methods were used when the building was first constructed. If such methods and methods were not used in the initial construction of the structure, plaintiffs argue that defendant may not utilize less costly materials and methods to repair the damage to their home. Defendant, on the other hand, argues that "original construction" refers to the time when the loss occurred, not to when the building was first constructed. Defendant maintains that the Policy allows for less costly construction materials and methods so long as the materials and methods are functionally equivalent to the materials repaired or replaced. I agree.

Under Oregon law, "[i]nterpretation of an insurance policy is a question of law, and [the court's] task is to ascertain the intention of the parties to the insurance policy" by looking to "the terms and conditions of the insurance policy." *Holloway v. Republic Indem. Co. of Am.*, 341 Or. 642, 649-50, 147 P.3d 329 (2006) (citation omitted). Oregon has established a three-step analysis for ascertaining the intention of parties in insurance policies. *Id.* at 650, 147 P.3d 329. First, courts look for explicit definitions in the insurance policy and, if present, apply the term as defined in the policy. *Id.* Second, the court will determine whether the term or phrase is ambiguous, *i.e.*, whether the term or phrase is "is susceptible to only one plausible interpretation." *Id.* (quoting *Groshong v. Mutual of Enumclaw Ins. Co.*, 329 Or. 303, 308, 985

P.2d 1284 (1999)). If the term or phrase is only susceptible to one plausible interpretation, the court will apply it. *Id.* If the term is susceptible to more than one plausible interpretation, the court will examine the term or phrase in "the particular context in which that [phrase] is used in the policy and the broader context of the policy as a whole." *Id.* (quoting *Hoffman Construction Co. v. Fred S. James. & Co.*, 313 Or. 464, 470, 836 P.2d 703 (1992)). Third, if any ambiguity remains after examining the phrase in context, the court will construe the phrase against the drafter and apply the plausible interpretation that the non-drafting party advanced. *Id.*

I find that defendant's interpretation gives effect to language of the Policy. Importantly, the Policy provides coverage for *functional* replacement costs, not for actual replacement costs or replacement costs in general. By its express terms, the Policy refers to replacement construction materials or methods that are *functionally* equivalent to those used with respect to the damaged portion of the structure; in other words, the replacement materials and methods must serve the same function as those being replaced or repaired. Moreover, the Policy is not intended to provide replacement coverage only for damaged portions that were part of the original construction of the building. Under plaintiffs' interpretation, damage to any portion of a building that was remodeled or added after the initial construction would not be covered by the Policy, and they would not be entitled to the replacement value of any part of the building that was not part of the original construction.

Thus, in light of the context of the phrase, and the broader context of the policy as a whole, I agree with defendant's construction of the phrase. Defendant's motion for summary judgment is granted as to the meaning of "functional replacement cost."

E. *Depreciation of Labor*

The parties also move for summary judgment on the issue of whether labor is depreciable

when determining ACV of the damaged structure. The parties agree that the Policy does not define ACV, and the parties maintain that ACV is calculated generally as RCV less depreciation. The parties dispute whether labor can ever be depreciable under this analysis.

Plaintiffs argue that the plain meaning of depreciation implicates only material objects subject to "wear, tear, or obsolescence" and should not include labor. Pl.'s Mot. at 17. Defendant agrees that labor, on its own, is not subject to depreciation. Rather, defendant argues that labor is depreciable when necessary to create a product that is itself subject to wear, tear, or obsolescence. For example, according to defendant, an installed roof is the product of labor and materials and is subject to depreciation, because the value of the roof derives not only from the roofing materials but also from the labor required to install them.

Oregon courts have not discussed this issue. Several other courts have found that the failure of an insurance policy to address depreciation of labor renders the term "actual cash value" ambiguous, and that the ambiguity should be construed against the insurance policy and disallow the depreciation of labor necessary to repair damage to a structure. *See, e.g., Adams v. Cameron Mut. Ins. Co.*, 430 S.W.3d 675, 678-79 (Ark. 2013). Others have held that the cost of labor to repair or replace damaged property is one of several factors that may be considered when determining depreciation and ACV. *E.g., Wilcox v. State Farm Fire & Cas. Co.*, 874 N.W.2d 780, 784-85 (Minn. 2016); *Redcorn v. State Farm Fire & Cas. Co.*, 55 P.3d 1017, 1021 (Okla. 2002). I am not convinced that the term "actual cash value" is ambiguous or that depreciation of labor is never relevant to ACV. Although the term "actual cash value" is not defined by the Policy, this phrase generally means the value of the actual loss sustain by the insured.

Further, I find persuasive the reasoning in *Wilcox* and agree that depreciation of labor is

14 – OPINION AND ORDER

one of several factors that may be considered "when such evidence logically tends to establish the actual cash value of a covered loss." 874 N.W.2d. at 785. When determining the actual cash value of damaged property, numerous factors may be relevant, including the depreciation of materials and sometimes labor. *Id.* at 784-85. When a party contracts for insurance coverage, they are not contracting for coverage of the materials necessary to replace the damaged building but for coverage of the finished product. In some instances, such as when a roof or siding must be replaced or repaired, the value of the finished product will incorporate materials and "embedded" labor. *Id.* Thus, when calculating ACV, the labor necessary for replacement of certain parts of the structure may be depreciable; it depends on the on the nature of damage being replaced and other factors related to ACV.

Accordingly, I do not find, as a matter of law, that the cost of labor is or is not subject to depreciation when calculating ACV. Rather, depreciation of labor is a case-specific issue. Here, the parties did not provide details regarding defendant's depreciation of labor in calculating ACV. Therefore, their motions for summary judgment are denied.

*F. Fungi Limitation*

Finally, defendant moves for summary judgment on the issue of whether the fungi limit applies. Plaintiffs respond that there is no dispute that losses and costs arising from fungi, wet or dry rot, or bacteria are subject to a coverage limit of $10,000. Accordingly, defendant's motion is granted to this limited extent.

CONCLUSION

Defendant's Motion for Partial Summary Judgment (doc. 51) is granted with respect to the meaning and application of functional replacement cost and fungi limitation and is denied in all other respects. Plaintiffs' Motions for Partial Summary (docs. 47, 67) are DENIED. The

15 – OPINION AND ORDER

parties are instructed to contact Paul Bruch, courtroom deputy for U.S. Magistrate Judge Thomas Coffin, at 541-431-4111, to schedule a settlement conference.

IT IS SO ORDERED.

Dated this 20th day of December, 2016

                /s/ Ann Aiken
                Ann Aiken
                United States District Judge